UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

BRANDON HANSON,

                    Plaintiff,

      v.

NEW YORK CITY, NEW YORK CITY POLICE
DEPARTMENT, ROMEO FRANCIS, DANIEL
GARCIA, KEVIN GOLDEN and JOHN DOES 1–3,

                    Defendants.

-------------------------------------------------------------

**MEMORANDUM & ORDER**
15-CV-1447 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Brandon Hanson brings this civil rights action against New York City (the

"City"), the New York City Police Department (the "NYPD"), NYPD Officers Romeo Francis,

Daniel Garcia, Kevin Golden, and three John Doe Defendants, alleging false arrest, excessive

force and a violation of Plaintiff's right to a fair trial under 42 U.S.C. § 1983. (Am. Compl.,

Docket Entry No. 31.) Plaintiff also brings a claim for municipal liability against the City. (*Id.*)

The City, Francis and Golden (collectively "City Defendants") move for summary judgment with

respect to all of Plaintiff's causes of action, as well as the first three of Garcia's four cross-

claims.[1] (City Defs. Mot. for Summ. J. ("City Defs. Mot."), Docket Entry No. 40; City Defs.

---

[1] Garcia's first cross-claim is a contribution claim, alleging that any damages that might
be recovered by Plaintiff against Garcia are "due to the culpable conduct, negligent acts of
omission or commission of [the City]." (Def. Garcia Answer to the Am. Compl. ("Def. Garcia
Answer"), Docket Entry No. 33.) His second and third cross-claims are based on *respondeat
superior*, as Garcia alleges that he was acting "within the scope of his duties and . . . employment
as a New York City Police Officer," and therefore the City is responsible for any judgment arising
from his acts or omissions. (*Id.*) Garcia's fourth cross-claim alleges that the City is liable for any
judgment recovered against Garcia by operation of New York General Municipal Law
section 50-k. (*Id.*)

Mem. in Supp. of City Defs. Mot. ("City Defs. Mem."), Docket Entry No. 42.) Garcia moves for summary judgment with respect to Plaintiff's claim for false arrest and denial of the right to a fair trial.[2] (Def. Garcia Mot. for Partial Summ. J. ("Garcia Mot."), Docket Entry No. 50; Def. Garcia Mem. in Supp. of Def. Garcia Mot. ("Garcia Mem."), Docket Entry No. 53.)

For the reasons set forth below, the Court grants the City Defendants' motion for summary judgment as to Plaintiff's claims for false arrest, excessive force, and denial of the right to a fair trial against Defendants Francis and Golden, and municipal liability claim against the City. The Court denies the City's motion for summary judgment as to Garcia's cross-claims without prejudice, and grants Garcia's motion for partial summary judgment as to Plaintiff's claims for false arrest and denial of the right to a fair trial.

## I. Background

### a. The Incident

Unless otherwise indicated, the following facts are either undisputed or drawn from Plaintiff's deposition testimony. The case arises from an incident which took place in the early morning hours of Thanksgiving Day on November 28, 2013. At the time, Plaintiff was twenty-four years old and living with his mother and stepfather in Brentwood, New York. (Pl. Statement of Undisputed Facts Pursuant to Local R. 56.1 ("Pl. 56.1"), ¶¶ 1, 69; City Defs. Statement of Undisputed Facts Pursuant to Local R. 56.1 ("City Defs. 56.1"), ¶ 1; Def. Garcia's Statement of Undisputed Facts Pursuant to Local R. 56.1 ("Garcia 56.1"), ¶ 1; Pl. Dep. 6, 18, annexed to Crotty Decl. as Ex. A, Docket Entry No. 49-1.) Plaintiff was a recent college graduate, having received his degree in Psychology in 2013, and was employed as a real estate agent. (Pl. Dep. 20–21.)

Sometime in the evening of November 27, 2013, Plaintiff went to visit a friend, Nick, at

---

[2] This case was reassigned to the undersigned on February 21, 2018.

his home in Bayside, Queens. (*Id.* at 25.) Plaintiff had decided to go drinking that night, (*id.* at 86), and he went to Nick's home to get "ready to go meet up" with other friends at one of the local bars, (*id.* at 26). At his October 25, 2015 deposition, Plaintiff could not recall how long he stayed at Nick's home, who else was there, or whether he had had any drinks. (*Id.* at 25–26.) However, when interviewed by officers of the NYPD's Internal Affairs Bureau ("IAB") sometime in March or April of 2014, Plaintiff recalled having two vodka and cranberry drinks before leaving Nick's house around midnight. (IAB Closing Statement 2, annexed to Crotty Decl. as Exhibit J, Docket Entry No. 49-10.)

Sometime in the late night of November 27, 2013, or early morning of November 28, 2013, Plaintiff went to "Bourbon Street," one of several bars located on Bell Boulevard in Bayside. (Pl. 56.1 ¶¶ 4, 72; City Defs. 56.1 ¶ 4; Garcia 56.1 ¶ 4.) Several of Plaintiff's friends, including Franco Medina, either arrived with Plaintiff or met him there. (Pl. Dep. 24, 26–27.) According to Plaintiff, Thanksgiving Eve is a "big night of going out," (Pl. Dep. 86–87), and the bar was crowded, (*id.* at 27).

Plaintiff had been at the bar "for hours" and had consumed at least five alcoholic mixed drinks when he realized that his watch was missing. (Pl. 56.1 ¶¶ 5–6; City Defs. 56.1 ¶¶ 5–6, 73–74; Garcia 56.1 ¶¶ 5–6.) Medina, who had alerted Plaintiff to this fact, told Plaintiff that he had seen someone with the watch. (Pl. 56.1 ¶ 7, 75; City Defs. 56.1 ¶ 7; Garcia 56.1 ¶ 7; Pl. Dep. 34.) When Plaintiff asked him who, Medina walked out of the bar and identified a man who was standing on the sidewalk. (Pl. 56.1 ¶¶ 7, 76; City Defs. 56.1 ¶ 7; Garcia 56.1 ¶ 8; Pl. Dep. 34–35, 92.) At his deposition, Plaintiff could recall very little about the individual, other than he was Caucasian, approximately Plaintiff's height of six feet, one inch; and standing with two or three male friends. (Pl. Dep. 18, 35–37.) Plaintiff did not know the individual and never learned his

name.  (Pl. Dep. 34–35.)

Plaintiff was angry that someone had taken his watch and confronted the individual amidst a "bunch of people" on the sidewalk in front of Bourbon Street.  (Pl. 56.1 ¶¶ 8, 79–81; City Defs. 56.1 ¶ 8; Garcia 56.1 ¶¶ 11–13; Pl. Dep. 36–37.)  When the individual denied having the watch, Plaintiff accused him of lying and a loud argument ensued.  (Pl. 56.1 ¶¶ 9, 82; City Defs. 56.1 ¶ 9; Garcia 56.1 ¶ 14; Pl. Dep. 36, 38.)  After some "back and forth," (Pl. Dep. 37), during which the men shouted at each other, (Pl. 56.1 ¶ 9, 82; City Defs. 56.1 ¶ 9; Garcia 56.1 ¶ 14), Plaintiff shoved the individual in the chest or upper torso.  (Pl. 56.1 ¶ 10, 83; City Defs. 56.1 ¶ 10; Garcia 56.1 ¶ 15; Pl. Dep. 36, 39.)

Several police officers, who were among eight or nine members of a special detail assigned to keep order that night at bars within the confines of the 111th Precinct, observed the altercation.  (Pl. 56.1 ¶¶ 2, 88–91; City Defs. 56.1 ¶ 2; Garcia 56.1 ¶¶ 20–23.)  Two of the officers, Defendants Garcia and Golden, were in a marked police car which was parked on Bell Boulevard, only fifteen to thirty feet away from the Bourbon Street bar.  (Pl. 56.1 ¶¶ 12, 92–93; City Defs. 56.1 ¶ 12; Garcia 56.1 ¶¶ 24–25.)  Three other officers, Defendant Francis and Officers Vernam and Cillis, were in a marked van that was parked one or two blocks away.  (Dep. of Romeo Francis ("Francis Dep.") 12, 15, 18, 21–22, 82, annexed to Crotty Decl. as Ex. D, Docket Entry No. 49-4.)  Sergeant Kevin Zweigbaum, who was in charge of the detail, and Officer Basilone, who was the driver, were in a marked car that was alongside the van at the time Cillis noticed the commotion.  (Dep. of Sgt. Zweigbaum ("Zweigbaum Dep.") 22–25, annexed to Crotty Decl. as Ex. E, Docket Entry No. 49-5.)

Upon viewing the altercation, Golden and Garcia exited their vehicle and approached the scene.  (Pl. 56.1 ¶¶ 16, 97; City Defs. 56.1 ¶ 16; Garcia 56.1 ¶ 29.)  Golden grabbed Plaintiff, the

combatant closest to him, by the waist from behind and pulled him away from the man he had just shoved. (Pl. 56.1 ¶¶ 11, 17, 98; City Defs. 56.1 ¶ 17; Garcia 56.1 ¶ 30; Dep. of Kevin Golden ("Golden Dep.") 21, 23, 25, annexed to Crotty Decl. as Ex. C, Docket Entry No. 49-3); Dep. of Daniel Garcia ("Garcia Dep.") 102, annexed to Crotty Decl. as Ex. B, Docket Entry No. 49-2.) Plaintiff recalled being grabbed from behind immediately after he shoved the suspected thief, before the man had a chance to retaliate. (Pl. Dep. 38–39.)

Plaintiff has almost no recollection of what occurred thereafter. At his deposition, Plaintiff initially testified that he recalled "swinging [his] arms" at the person who grabbed him. (*Id.* at 38.) Later, he recalled going into "defense mode" and feeling "like [he] was being attacked." (*Id.* at 41.) He testified that it was possible that he kicked and threw punches, but that he had no recollection of the incident. (*Id.* at 41–42.) The next thing Plaintiff recalled was sitting in the back of a police car, "not knowing what was going on." (*Id.* at 42.) Plaintiff claimed that his lapse of memory was due to "[b]eing overwhelmed by the situation," and not due to alcohol or any form of head trauma. (*Id.* at 43.)

Golden and Garcia provided detailed, and largely consistent, testimony regarding what occurred after Golden grabbed Plaintiff. According to both officers, Golden immediately released Plaintiff, who then turned and faced the officers. (Golden Dep. 21, 24–25; Garcia Dep. 34, 46.) Although the officers were in uniforms and Plaintiff looked directly at them, Plaintiff unleashed a flurry of punches toward the officers, who were standing next to each other. (Golden Dep. 34; Garcia Dep. 34, 46.)

According to both officers, Plaintiff punched Garcia in the head. (Golden Dep. 34, 75; Garcia Dep. 34, 46.) Golden testified that he ducked Plaintiff's initial punch, which then connected with Garcia's face. (Golden Dep. 34.) Garcia testified that Plaintiff struck him in the

face multiple times as Garcia tried in vain to get control of Plaintiff's hands or to get close enough to Plaintiff to prevent him from extending his arms. (Garcia Dep. 34, 48–49.)

According to Golden, Plaintiff continued to fight for approximately two minutes before Golden managed to hook a leg behind Plaintiff's ankle and push him to the ground. (*Id.* at 36, 75.) Garcia, who lost track of Golden during the fight, testified that he did not know how Plaintiff fell. (Garcia Dep. 47, 49, 52.) However, both officers recalled that Plaintiff fell on his back in the street, and not face-first. (Golden Dep. 35–36, 76–77; Garcia Dep. 35, 105.)

It is unclear what happened after Plaintiff was taken down to the ground. At first, Golden testified that he landed on top of Plaintiff and was holding him by his hands. (Golden Dep. 34.) Later, Golden testified that he was on top of Plaintiff with his knees on Plaintiff's shoulders and his wrist. (*Id.* at 35.) Garcia, in contrast, testified that Plaintiff had his right arm wrapped around the back of Garcia's neck when the three men fell, and that Plaintiff used his left hand to punch Garcia in the side of the head while they were on the ground. (Garcia Dep. 53–54.)

The officers' testimony regarding what happened on the ground is consistent in at least two respects. First, both officers testified that they repeatedly identified themselves as police officers shortly after they fell. Garcia testified that he was yelling, "police, police," at the time when Plaintiff had his arm around Garcia's head. (*Id.* at 69–70.) Golden recalled screaming at Plaintiff after they fell, repeatedly commanding him to "stop resisting" and telling him, "you're fighting with the police." (Golden Dep. 34, 43, 77.) Second, both officers testified that Plaintiff disregarded their commands and continued to fight. Golden testified that Plaintiff continued "being violent," attempting to kick the officers off of him and "absolutely" resisting arrest. (Golden Dep. 34, 75, 77.) Garcia recalled that Plaintiff "never at any point stopped fighting." (Garcia Dep. 36.) After Garcia managed to get his head free from Plaintiff's grasp, Plaintiff was

"throwing his legs around" and kicked Garcia in the side of the head. (*Id*. at 36.)

Officers Golden and Garcia were still trying to handcuff Plaintiff when other officers arrived. (Garcia Dep. 59–60; Golden Dep. 79.) Garcia testified that Plaintiff was "still on the ground fighting," and recalled that he was "kicking his legs, throwing his arms [and] refusing to be placed under arrest" at the time Sergeant Zweigbaum and Officer Francis arrived. (Garcia Dep. 60.) Golden testified that Plaintiff never willingly put his hands behind his back and that he and Garcia never managed to handcuff Plaintiff. (Golden Dep. 78–79.)

Sergeant Zweigbaum testified that he and Basilone arrived on the scene "[a] couple of seconds" after Cillis alerted him to the commotion. (Zweigbaum Dep. 24, 27, 79.) The sergeant arrived to see "two officers on the ground trying to get a person in handcuffs." (*Id.* at 27.) The man, later identified as Plaintiff, was kicking his feet, rolling around, and disregarding the officers' commands to put his arms behind his back. (*Id*. at 28, 33–34.)

Zweigbaum's testimony was corroborated by Francis, whose van arrived on the scene seconds after Zweigbaum's car. Francis testified that he arrived at the scene to see Garcia and Golden wrestling with Plaintiff. (Francis Dep. 23.) Francis believed that the officers were trying to place Plaintiff under arrest, although he did not know why the officers were arresting him. (*Id.*)

Zweigbaum testified that he immediately "took control," pushing Garcia out of the way and taking his position on the right side of Plaintiff. (Zweigbaum Dep. 28, 37.) The sergeant testified that he chose to relieve Garcia because he was closest to the street and appeared to be "stunned" and "exhausted," not because Garcia was doing anything improper. (*Id.* at 34, 39–40, 81.) Zweigbaum stated that he did not see Garcia say anything to Plaintiff, even though Plaintiff was "yelling profanities." (*Id.* at 37–38.) Zweigbaum and another officer eventually managed to

handcuff Plaintiff. (*Id*. at 35, 84.) However, the sergeant was unsure who the other officer was, stating that it was either Golden or Vernam. (*Id*. at 35.)

After the sergeant relieved Garcia but "probably, maybe, a minute" before he succeeded in handcuffing Plaintiff, Zweigbaum saw Garcia make "kicking motions" toward Plaintiff. (*Id*. at 35–36, 84–85.) The sergeant testified that he only saw the kicks "[o]ut of the corner of [his] eye, but believed that they were towards Plaintiff's "lower extremities." (*Id.* at 37, 56.) He further testified that Plaintiff was also attempting to kick Garcia at the time, and that he did not know if any of Garcia's kicks connected. (*Id.* at 36, 50, 55–56, 85.) The sergeant refused to characterize Garcia's actions as "stomping," saying, "I didn't see [Garcia] stomp on him." (*Id*. at 35.) Nonetheless, he recalled either motioning to Francis to remove Garcia or motioning to both Francis and Garcia to leave the scene. (*Id*. at 39, 50.)

In contrast, Garcia not only admitted stomping on Plaintiff, but testified that he had done so deliberately. Garcia testified that he stomped on Plaintiff's stomach three times in order to enable his fellow officers to gain control of the struggling Plaintiff. (Garcia Dep. 37, 60–63.) He characterized these stomps as "softening blows," which he defined as blows "to cause either temporary pain or distraction so that you can then gain control of the individual." (Pl. 56.1 ¶ 49, City Defs. 56.1 ¶ 49.) Garcia implied that the technique had worked, stating that it was only after the blows that Plaintiff finally stopped fighting. (*Id.* at 37.)

After handcuffing Plaintiff, Zweigbaum assigned Francis to be the arresting officer. (Zweigbaum Dep. 44, 85; Francis Dep. 30.) Francis had arrived at the scene in time to see Garcia and Golden wrestling on the ground with Plaintiff, but did not know why they were arresting him. (Francis Dep. 23.) Accordingly, all of the factual allegations contained in the documents prepared by Francis were based on statements made to him by Garcia and Golden. (*Id*. at 31–32, 41.)

Francis recalled that he spoke to those officers before preparing the arrest report, but he could not recall whether he had spoken to them at the precinct or over the phone. (*Id*. at 43.)

Both Golden and Garcia were injured during the incident. Both officers suffered a black eye as a result of being punched by Plaintiff. (Pl. 56.1 ¶¶ 111, 112; City Defs. 56.1 ¶ 112, Garcia 56.1 ¶¶ 54, 55.) In addition, Golden suffered a strained left elbow and an injury to his neck, (Pl. 56.1 ¶ 112; City Defs. 56.1 ¶ 112, Garcia 56.1 ¶ 55), while Garcia sustained a laceration to the face, a bloody nose, and a swollen, scraped knee, (Pl. 56.1 ¶ 111; City Defs. 56.1 ¶ 111, Garcia 56.1 ¶ 54). These injuries did not prevent the two officers from driving their patrol car back to the precinct. (Golden Dep. 42, 81; Garcia Dep. 70.)

Other officers transported Plaintiff to the 111th Precinct. (Pl. 56.1 ¶¶ 42; City Defs. 56.1 ¶ 42, Garcia 56.1 ¶ 52.) According to Plaintiff, he was initially taken to a "main area," in front of a desk. (Pl. Dep. 51.) There, he was confronted by a white, male officer, whose identity was unknown to Plaintiff even at the time of his deposition. (*Id*.) The officer appeared upset, and allegedly told Plaintiff, "You hit me, you motherf—r." (*Id*.) Although Plaintiff did not know whether he had struck the officer or not, he apologized, saying, "I would have never intentionally hit an officer." (*Id*. at 51–53.) The officer responded: "Yeah, yeah, yeah, go f—k yourself." (*Id*. at 51.)

Plaintiff was subsequently placed in a cell where he remained for a few hours. (Pl. Dep. 53–54.) There, an officer informed him that he had been arrested for assaulting a police officer. (*Id*. at 54.) Although Plaintiff was unable to identify the officer, (*id*.), Zweigbaum recalled going to the holding cell to check on Plaintiff's condition, (Zweigbaum Dep. 62). According to the sergeant, Plaintiff told him: "I'm sorry. I didn't know they were police officers." (*Id*.)

At his deposition, Plaintiff recalled that he was "in a lot of pain" while he was in the

holding cell.  (Pl. Dep. 55.)  He complained to an officer that his chest and back hurt, that he had scratches and bruises on his face and back, and that he had a chipped right front tooth.  (*Id*. at 55, 77.)  Plaintiff testified that he had a crown on that tooth prior to the incident, but he had no recollection of how he chipped his tooth.  (*Id*. at 72, 98–99.)

At some point, someone at the precinct called an ambulance for Golden, Garcia and Plaintiff.  (Zweigbaum Dep. 59–60.)  At his deposition, Plaintiff initially denied that he had been seen by Emergency Medical Services at the precinct.  (Pl. Dep. 55–56.)  However, when shown a form indicating that he had refused medical treatment, Plaintiff admitted that he had signed the form and stated that he had no reason to question its accuracy.  (*Id*. at 57.)  Plaintiff later offered an explanation for why he refused treatment, stating: "I did not request medical treatment.  I just wanted to leave and go home because it was Thanksgiving."  (*Id*. at 61.)

Garcia and Golden were transported to a hospital, where they were treated and released. (Pl. 56.1 ¶ 110; City Defs. 56.1 ¶ 110, Garcia 56.1 ¶ 53.)  As Zweigbaum explained, the officers were required to go to the hospital because they were injured in the line of duty.  (Zweigbaum Dep. 89–90.)  Pursuant to this procedure, both officers visited the NYPD's Medical Division the next day to determine their fitness for duty.  (Golden Dep. 53; Garcia Dep. 77).  Both officers were out of duty for a few days thereafter.  (*Id.*)

### b.  The criminal court proceedings

Relying on information provided by Officers Garcia and Golden, Officer Francis prepared an arrest report charging Plaintiff with assault in the second degree, resisting arrest, reckless endangerment in the second degree and seven counts of disorderly conduct.  (*See* Arrest Report annexed to Crotty Decl. as Ex. K, Docket Entry No. 49-11.)  The assault charge alleged a violation of New York Penal Law section 120.05(3) and was predicated on Garcia's and Golden's

claims that Plaintiff had struck them, causing the officers to sustain various physical injuries. (*Id.*) The reckless endangerment charge alleged a violation of New York Penal Law section 120.20, and was predicated on the theory that Plaintiff had recklessly engaged in conduct which created a substantial risk of serious physical injury to Officers Garcia and Golden. (*Id.*; Francis Dep. 47.)

The criminal court complaint ("Criminal Complaint") on which Plaintiff was arraigned, however, contained only six charges. (Criminal Court Compl. ("Criminal Compl."), annexed to Crotty Decl. as Ex. L, Docket Entry No. 49-12.) That document charged Plaintiff with two counts of assault in the second degree in violation of New York Penal Law section 120.05(3), resisting arrest, and three counts of disorderly conduct. (Pl. 56.1 ¶¶ 115; City Defs. 56.1 ¶ 115, Garcia 56.1 ¶ 58; Criminal Compl.) The disorderly conduct counts alleged violations of New York Penal Law section 240.20(1) (engaging in fighting or violent behavior); section 240.20(2) (making unreasonable noise), and section 240.20(5) (obstructing vehicular or pedestrian traffic). (*Id.*) The Criminal Complaint was sworn by Francis, but was based on facts told to him by Officers Garcia and Golden. (Pl. 56.1 ¶ 117; City Defs. 56.1 ¶ 117, Garcia 56.1 ¶ 60.)

Plaintiff was arraigned in the Criminal Court of the City of New York, Queens County, sometime after 6:00 P.M. on Thanksgiving Day. (Pl. Dep. 62.) Plaintiff pleaded not guilty and was released on recognizance. (Pl. 56.1 ¶¶ 116; City Defs. 56.1 ¶ 116, Garcia 56.1 ¶ 59.)

### c. The videotape

At some point after the incident, Plaintiff learned that a bystander had taken a video of the November 28, 2013, incident. (Pl. Dep. 43.) The video had apparently been posted on social media, and a friend sent Plaintiff an electronic copy. (Pl. Dep. 45–46.) Plaintiff provided it to his attorney, and a copy of that video has been submitted to the Court. (*See* Pl. Ex. M, annexed to

Crotty Decl., Docket Entry No. 49-13.)

The video, which lasts fifty-one seconds, appears to show the end of the struggle between Plaintiff and the officers. (*Id.*) The video was shown to officers Garcia, Golden, Francis and Zweigbaum. They implicitly authenticated the video by identifying officers and narrating events depicted in the video.

The video, which is filmed from the sidewalk, begins sometime after Golden and Garcia took Plaintiff down to the ground, and less than two seconds before Zweigbaum and Basilone arrive on the scene. (Pl. Ex. M.) The beginning of the video shows Golden and Garcia kneeling on either side of an individual, presumably Plaintiff, who is rolling on the ground and flailing his legs. (*Id.*) Although the view of the top half of Plaintiff is obscured by the officer nearest to the sidewalk, identified by Garcia as Golden, (Garcia Dep. 111), it appears from the position of his white-soled shoes that Plaintiff is on his back and that the officers are attempting to roll him over. (Pl. Ex. M.) During the first two seconds of the video, the officer closest to the street, presumably Garcia, suddenly turns his head away from the fracas, as if struck in the head. (*Id.*)

One second later, a marked police car, its turret lights flashing, darts into the frame. (*Id.*) The passenger door of the car opens before the car jerks to a halt. (*Id.*) However, before anyone emerges from the car, the camera pans to the left, towards bystanders on the sidewalk. (*Id.*) A few seconds later, the camera pans momentarily back to the street and shows a uniformed officer, with chevrons on his jacket, standing near Plaintiff's head. (*Id.*) Garcia identified that officer as Sergeant Zweigbaum. (Garcia Dep. 111–12.) An officer is kneeling to the far side of Plaintiff, but appears to be no longer engaged in the struggle. (*Id.*)

After very briefly panning back to the sidewalk, the camera again focuses on the incident. (*Id.*) About nine seconds into the video, the sergeant kneels down on the far side of Plaintiff.

(*Id.*) Another officer is bending over or kneeling on the near side of Plaintiff, with his left side to the camera, obscuring the view of Plaintiff. (*Id.*) A second officer is walking toward the camera from between the back of the patrol car and the front of a police van. (*Id.*) A third officer is standing to the right of the sergeant. (*Id.*)

Approximately twelve seconds into the video, the third officer approaches Plaintiff, who by this time appears to be flat on his back with an officer on either side of him and another officer standing near his head. (*Id.*) The third officer, presumably Garcia, then appears to deliberately stomp three times toward the man's midsection, his leg close to the sergeant's left shoulder. (*Id.*) Plaintiff appears to kick back toward his assailant. (*Id.*)

Because the individual's body is obscured by the other officers and because the scene is dimly lit, it is unclear whether and where the stomps landed. However, after the second stomp, the sergeant looks at the stomping officer and moves his left elbow out, as if to elbow that officer away. (*Id.*) He continues to stare at the officer for several seconds, as another officer walks into the frame from the left, places a hand on the stomping officer's shoulder and directs him toward the sidewalk. (*Id.*) At his deposition, the sergeant testified that Francis was the officer who pushed Garcia toward the sidewalk, and that he had "motioned" to Francis. (Zweigbaum Dep. 50).

Francis then turns toward Plaintiff's feet and bends over for a second or two, touching Plaintiff gently on the knee. (Pl. Ex. M.) Francis then approaches Garcia, who is standing on the sidewalk with his back to the camera. (*Id.*) Garcia appears to retreat from the scene ahead of Francis, as the camera pans toward bystanders on the sidewalk to the videographer's right. (*Id.*) One of the bystanders, identified by Plaintiff as his friend, Medina, (Pl. Dep. 49), has his hand over his mouth. (Pl. Ex. M.)

The camera pans back toward the incident about five seconds later, by which time at least three officers are standing on the near side of Plaintiff, obscuring the view of the people on the ground. (*Id.*) The sergeant is occasionally visible through the crowd of officers, still kneeling on the ground. (*Id.*) Plaintiff is not discernible until approximately forty-one seconds into the video, when one can see his shoes as he rolls into the prone position. (*Id.*)

**d. The subsequent investigations**

On January 3, 2014, Plaintiff's attorney filed a complaint with the NYPD's IAB on behalf of Plaintiff. (Civilian Complaint Review Board ("CCRB") Case Summ. 2, annexed to Crotty Decl. as Ex. G, Docket Entry No. 49-7.) The case was forwarded to the CCRB on January 9, 2014. (*Id.*) Both the CCRB and IAB conducted investigations of the incident, generating reports, which appear as Exhibits G through J annexed to the Crotty Declaration.

Exhibit G, identified in the Crotty Declaration as the CCRB's Case Summary, briefly summarizes the video, as well as the CCRB's interviews with Garcia, Golden and Hanson. Exhibit H is a more detailed summary of Golden's statements to the CCRB. As summarized in these documents, the testimony of the three officers appears to have been largely consistent with the deposition testimony discussed above. However, in statements to the CCRB, Garcia admitted that the stomps occurred while two other officers had physical contact with both of Plaintiff's arms, and Zweigbaum testified that Plaintiff was already struggling less before the stomping occurred. (CCRB Case Summ. 3.) On the basis of these statements, the CCRB determined, by a preponderance of evidence, that Garcia had "used physical force against [Plaintiff] without proper justification." (*Id.*)

The CCRB also investigated two other allegations: that Garcia "spoke rudely" to Plaintiff (1) during the stomping; and (2) again in the 111th Precinct. With respect to the former

allegation, the CCRB found that Medina and all officers stated that they did not hear Garcia say anything during the stomping and that "the video did not pick up any profanity by the officers." (*Id*. at 4.) With respect to the latter allegation, the CCRB concluded that Garcia was at the hospital, not the precinct, at the time he was alleged to have sworn at Plaintiff. (*Id*.) Accordingly, the CCRB determined, by a preponderance of evidence, that Garcia did not speak rudely to Plaintiff. (*Id*.)

Exhibit I to the Crotty Declaration summarizes statements made by Zweigbaum during a hearing before the IAB. As summarized, those statements appear to be largely consistent with the testimony that Zweigbaum gave during his deposition, with two notable exceptions. First, Zweigbaum recalled instructing Francis to remove Garcia from the scene after the kicks, not merely motioning to Francis. Second, Zweigbaum also recalled that Garcia told him: (1) that Plaintiff had been "causing problems inside of Bourbon Street"; and (2) that he and Golden had "enter[ed] the establishment for the purpose of controlling" Plaintiff.

Exhibit J is the IAB's "Closing Statement" dated April 8, 2014, a five-page summary of the IAB's investigation. That document summarizes the IAB's interviews with Zweigbaum, Garcia, Plaintiff, Medina and Jaime Aragon, the bystander who videotaped the incident. The summary of the Zweigbaum interview is almost identical to that contained in Exhibit I, discussed above. The summary of the Garcia interview suggests that Garcia's statement to the IAB was consistent with his deposition testimony.[3]

Plaintiff's testimony was also largely consistent with his deposition testimony, except in

---

[3] Notably, Garcia did not testify that Plaintiff had been causing problems in the bar or that he entered the establishment. Rather, Garcia told the IAB that he saw Plaintiff "initiate a fight" with individuals outside the bar. (*See* IAB Closing Statement 4, annexed to Crotty Decl. as Ex. J, Docket Entry No. 49-10.)

the following respects.  First, Plaintiff recalled drinking two mixed drinks at Nick's house and at least six additional drinks thereafter, and he admitted that he was "definitely intoxicated" at the time of the incident.  (*Id*. at 2.)  Second, he recalled that he "swung punches at whoever it was who grabbed him" from behind.  (*Id*.)  He claimed that he had no idea who had grabbed him, and that he later apologized to the officer who confronted him at the precinct, explaining that he would not have attempted to punch him had he realized that he was an officer.  (*Id*.)

Medina's statements confirmed that Plaintiff had consumed "multiple drinks" during the one to one-and-a-half hours they spent together in Bourbon Street, and that Plaintiff was "definitely intoxicated."  (*Id*. at 3.)  He stated that Plaintiff had been ejected from the bar before the shoving incident and that Medina, seeing the police presence, had attempted to calm Plaintiff down.  (*Id.*)  Medina observed one of the officers walk up behind Plaintiff and grab him in a bear-hug, and he told IAB investigators that Plaintiff "immediately began kicking and throwing his arms," hitting one of the officers.  (*Id.*)

Aragon stated that he was at the bar with his friend, Medina, and witnessed the incident. He observed Plaintiff, whom he characterized as "intoxicated," getting into a fight with a group of other men outside the bar.  When the police grabbed him, Plaintiff hit the same officer who is observed kicking him in the video.  (*Id*.)

Based on this testimony and the video, the IAB concluded that Plaintiff's allegation of unnecessary force was substantiated.  (*Id.* at 1.)  The IAB specifically concluded that Garcia had kicked Plaintiff "three times in the upper torso without police necessity."  (*Id*. at 5.)  Garcia lost three vacation days as a penalty.  (*Id.*; Garcia Dep. 98.)

On February 6, 2014, the criminal case against Plaintiff was adjourned in contemplation of dismissal pursuant to New York Criminal Procedure Law section 170.55.  (Pl. 56.1 ¶ 118; City

Defs. 56.1 ¶ 118; Garcia 56.1 ¶ 61.) All charges against Plaintiff were dismissed six months later on August 5, 2014. (*Id.*) Approximately eight-and-a-half months later, Plaintiff commenced this action.

### e. Procedural background

Plaintiff commenced this action in March of 2015 by filing a Complaint against the City, the NYPD, Officers Francis, Garcia and Golden, and three John Doe Defendants. (Compl., Docket Entry No. 1.) The original pleading contained four causes of action, all of which were brought pursuant to 42 U.S.C. § 1983 and all of which alleged a violation of Plaintiff's Fourth and Fourteenth Amendment rights to be free from unlawful searches and seizures. (*Id.*) The first of these causes of action alleged that all Defendants had falsely arrested Plaintiff. (*Id.*) The second accused Defendants of maliciously prosecuting Plaintiff without legal justification and without probable cause. (*Id.*) The third alleged that Defendants used excessive and unreasonable force in effecting Plaintiff's arrest. (*Id.*) The fourth asserted that the Defendants violated Plaintiff's right to a fair trial by forwarding false information to prosecutors, which resulted in a deprivation of liberty. (*Id.*)

The Corporation Counsel of the City of New York subsequently filed an answer on behalf of the three City Defendants but explained that they were not answering on behalf of Officer Garcia because they did not represent him. (City Defs. Answer 1, n. 1., Docket Entry No. 6.)

In July of 2015, a private law firm filed an answer on behalf of Officer Garcia. (Def. Garcia Answer, Docket Entry No. 17.) Garcia's answer contained four cross-claims against the City. (*Id.*)

After the close of discovery, both the City Defendants and Garcia filed pre-motion conference requests. (City Defs. Letter dated Jan. 25, 2916, Docket Entry No. 26; Garcia Letter

dated Jan. 25, 2016, Docket Entry No. 27.) The City Defendants sought to move for summary judgment arguing, *inter alia*, that Plaintiff's malicious prosecution claim against the City did not provide a basis for municipal liability under *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978). In his response, Plaintiff conceded that his malicious prosecution claim was untenable and requested permission to amend his pleading with respect to the *Monell* claim. (Pl. Letter dated Feb. 1, 2016, 2, Docket Entry No. 28.)

By order dated April 8, 2016, the Court dismissed Plaintiff's malicious prosecution claim, granted Plaintiff leave to amend the Complaint, and directed the parties to propose a briefing schedule for the summary judgment motions. (April 2016 Order, Docket Entry No. 29.) On April 29, 2016, Plaintiff filed an Amended Complaint that is essentially identical to the original Complaint, except that it contains a *Monell* claim instead of the malicious prosecution claim. (Am. Compl. ¶ 57.) The *Monell* claim asserts that the City has a custom and practice of "deliberate indifference in training" and "in supervision and discipline of police officers who use excessive force." (*Id.*) In support of this allegation, the Amended Complaint cites exclusively to a 2015 report issued by the New York City Department of Investigations (the "DOI") entitled, "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices." (*Id.*). All named Defendants answered the Amended Complaint.

The City Defendants now move for summary judgment as to all four causes of action alleged in the Amended Complaint. (*See generally* City Defs. Mem.) First, they argue that Plaintiff's false arrest claim fails as a matter of law because there was probable cause to arrest Plaintiff. (City Defs. Mem. 8.) Second, they argue that Francis did not use any force and that Golden did not use excessive force. (*Id.* at 11–12.) In the alternative, the City Defendants argue that Francis and Golden are entitled to qualified immunity on both the false arrest and excessive

force claims. (*Id.* at 16.) With respect to the claim that Plaintiff was denied his right to a fair trial, the City Defendants argue that Plaintiff cannot prove that Francis or Golden created any false evidence. (*Id.* at 19.) With respect to the *Monell* claim, the City cites to two district court cases holding that the IG's Report is insufficient to support a *Monell* claim. (*Id.* at 20.)

As to Garcia's cross-claims against the City, the City Defendants seek summary judgment with respect to the first three of Garcia's four cross-claims, arguing that Garcia is attempting "to circumvent the well-established precepts that a municipality may not be held liable under section 1983 on the basis of *respondeat superior* . . . and that negligence is not a basis of liability for constitutional torts." (City Defs. Mem. 24.)

Garcia moves for partial summary judgment, advancing three of the same arguments raised by the City Defendants. (*See generally* Def. Garcia Mem.) First, Garcia argues that Plaintiff's false arrest claim should be dismissed because there was probable cause to arrest Plaintiff both for his actions towards the person who allegedly stole his watch and for his actions towards the police officers. (*Id.* at 4–5.) Second, Garcia argues that he is entitled to qualified immunity on the false arrest claim because there was at least arguable probable cause to arrest Plaintiff. (*Id.* at 10.) Third, Garcia argues that Plaintiff cannot make out the elements of a claim for the violation of the right to a fair trial. (*Id.* at 12.) Garcia does not seek summary judgment with respect to the excessive force claim.

Plaintiff opposes the summary judgment motions with respect to the four causes of actions alleged in the Amended Complaint, (Pl. Mem. in Opp'n to Defs. Mot. for Summ. J. ("Pl. Opp'n"), Docket Entry No. 48), and all named Defendants have filed reply memoranda. (City Defs. Reply, Docket Entry No. 44; Def. Garcia Reply, Docket Entry No. 54.)

## II. Discussion

### a. Standard of Review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018); *see also Cortes v. MTA NYC Transit*, 802 F.3d 226, 230 (2d Cir. 2015). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b. Plaintiff's claim against the NYPD

Plaintiff's claim against the NYPD fails because the NYPD is not a suable entity. Section 396 of the New York City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law." N.Y. City Charter, chap. 17 § 396. This provision "has been construed to mean that New York City departments, as distinct from the City itself, lack the capacity to be sued." *Ximines v. George Wingate High Sch.*, 516

F.3d 156, 159–60 (2d Cir. 2008) (per curiam). Because NYPD is an agency of the City of New York, it is not amenable to suit. *See Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007) ("[T]he NYPD is a non-suable agency of the City."); *Morris v. N.Y.C. Police Dep't*, 59 Fed. Appx. 421, 422 (2d Cir. 2003) (affirming dismissal of claims asserted against the NYPD due to non-suable-entity status). Any action against the NYPD must be brought against the City of New York. Accordingly, the Court dismisses Plaintiff's claim against the NYPD.

### c. Plaintiff's false arrest claim

The City Defendants and Garcia argue that Plaintiff's false arrest claims fail because there was probable cause to arrest Plaintiff for (1) the altercation with the unidentified individual who allegedly stole his watch, (2) the assaults on Officers Golden and Garcia, and (3) resisting arrest. (*See generally* City Defs. Mem. and Def. Garcia Mem.)

The Fourth Amendment protects individuals from unreasonable searches and seizures by law enforcement officials. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). A law enforcement official violates the Fourth Amendment's protections if he or she arrests someone without probable cause. *Id.* Conversely, "probable cause is an absolute defense to a false arrest claim." *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (quoting *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 139 (2d Cir. 2010)). "A police officer has probable cause for an arrest when he has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime . . . .'" *Swartz v. Insogna*, 704 F.3d 105, 111 (2d Cir. 2013) (quoting *Weyant*, 101 F.3d at 852); *see also Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013). The reviewing court "must consider [only] those facts available to the officer at the time of the arrest and immediately before it." *Stansbury*, 721 F.3d at 89 (alteration in

original) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)).  The question is whether the facts known to the arresting officer, at the time of the arrest, objectively provided probable cause to support the arrest.  *Gonzalez*, 728 F.3d at 155.

### i. The officers had probable cause to arrest Plaintiff for disorderly conduct and harassment

The undisputed facts establish that the police had probable cause to arrest Plaintiff. Plaintiff admits to shouting at, then shoving, an individual on the crowded sidewalk in front of the Bourbon Street bar.  (Pl. 56.1 ¶¶ 9–10,15, 82–83; City Defs. 56.1 ¶¶ 9–10, 15; Garcia 56.1 ¶¶ 8–14; Pl. Dep. 36–38.)  Both Golden and Garcia personally witnessed this altercation, as evidenced by the fact that they immediately exited their police vehicle and the fact that Golden grabbed Plaintiff from behind and pulled him away from the individual.  (Pl. 56.1 ¶¶ 16–17, 84; City Defs. 56.1 ¶¶ 16–17; Garcia 56.1 ¶¶ 16.)  Both officers testified that they thought Plaintiff was fighting with someone.  (Golden Dep. 21, 69–70; Garcia Dep. 33, 40–41.)

Even assuming that Plaintiff was not yet throwing punches at the time Golden and Garcia intervened, the officers nonetheless had probable cause to arrest Plaintiff for either disorderly conduct or harassment in the second degree.  "A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof: (1) He engages in fighting or in violent, tumultuous or threatening behavior . . . ."  N.Y. Penal Law § 240.20.  "A person is guilty of harassment in the second degree when, with intent to harass, annoy or alarm another person: (1) He or she strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same . . . ."  N.Y. Penal Law § 240.26.  Although both disorderly conduct and harassment in the second degree are only violations, New York Penal Law permits police officers to arrest for violations committed in their presence.  *See* N.Y. Penal Law § 140.10(1)(a); *Ramos v. City of New York*, 298 F. App'x 84, 86

(2d Cir. 2008) ("Importantly, under New York law, the offense must occur in the officer's presence to provide probable cause to arrest for second-degree harassment, which is a misdemeanor violation" (citing N.Y. Penal Law § 140.10(1)(a))); *see also Davis v. United States,* 328 U.S. 582, 610 (1946) (discussing generally officer's authority to arrest for misdemeanor crimes committed in her presence.)

Plaintiff, angry that someone had taken his watch, confronted an individual and accused him of being the thief. When the individual denied having the watch, Plaintiff accused him of lying and a loud argument ensued. (Pl. 56.1 ¶¶ 9, 82; City Defs. 56.1 ¶ 9; Garcia 56.1 ¶ 14; Pl. Dep. 36, 38.) By Plaintiff's own account, there were a "bunch of people" outside when Plaintiff initiated a physical altercation by pushing or shoving the man whom he believed to have stolen his watch. (Pl. Dep. 37.) Two or three of the people were friends of the man he shoved. (*Id*. at 36–37.) Another was Plaintiff's friend, Medina. (*Id*. at 35.) Based on these facts, Officers Golden and Garcia had probable cause to believe that Plaintiff's actions posed the potential to incite a melee — the very sort of public disorder their detail had been created to prevent. The loud noise and physical altercation within a crowd present a sufficient basis for establishing probable cause for disorderly conduct or harassment in the second degree under New York Penal Law section 240.20 and section 240.26.

Plaintiff argues that the officers' observations did not give rise to probable cause that he violated these statutes. Plaintiff further argues that his testimony "could establish, at most, that any physical contact with another person was made while [Plaintiff] was protecting himself in a confrontation arising not out of an intent to harass, annoy or alarm anyone . . . ." (Pl. Opp'n 30.) However, Plaintiff testified that he "confronted" the individual identified by his friend Medina, accused the individual of lying when he denied having the missing watch, and then initiated the

physical contact by pushing or shoving the man in the torso. (Pl. Dep. 36–38.) This evidence does not support any inference that Plaintiff was merely protecting himself. To the contrary, Garcia testified that "[t]here was nobody coming at[ Plaintiff], fighting him, being offensive against him" and the fact that "[e]verybody was trying to get away" from him. (Garcia Dep. 33.)

Plaintiff also asserts that his conduct prior to the officers' intervention can be characterized as "primarily an argument over a private dispute concerning his personal property," that did "not rise to the level of [an] intentional public disturbance that would support probable cause to believe that [Plaintiff] had committed the offense of disorderly conduct." (Pl. Opp'n 11.) "[A] finding that defendant's disruptive statements and behavior were of a public rather than an individual dimension" is "critical to a charge of disorderly conduct." *People v. Baker*, 20 N.Y.3d 354, 359 (2013). As the New York Court of Appeals has explained, the disorderly conduct statute is violated only in "situations that carried beyond the concern of individual disputants to a point where they had become a potential or immediate public problem." *People v. Munafo*, 50 N.Y.2d 326, 331 (1980). "In deciding whether an act carries public ramifications, courts are constrained to assess the nature and number of those attracted, taking into account the surrounding circumstances, including, of course, the time and the place of the episode under scrutiny." *Id*. Here, as discussed above, the facts do not support the theory that Plaintiff was merely engaged in an "argument" or a "private dispute," without the potential of posing a threat to the public.

### ii. The officers had probable cause to arrest Plaintiff for resisting arrest

Officers also had probable cause to arrest Plaintiff for resisting arrest. "A person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a police officer . . . from effecting an authorized arrest of himself . . . ." N.Y. Penal Law § 205.30.

"Under New York law, an essential element of the offense of resisting arrest is that the arrest allegedly resisted was 'authorized[,]'" which means that the "arrest must either have been made pursuant to a warrant or have been based on probable cause." *Weyant*, 101 F.3d at 855 (internal citations omitted); *see also Murphy v. Lynn*, 118 F.3d 938, 948 (2d Cir. 1997) ("[A]s a matter of law, an arrest for resisting arrest is not lawful unless the arrest that was supposedly resisted was itself authorized, either by way of an arrest warrant or by the existence of probable cause."). In addition, the existence of a factual dispute about whether officers had probable cause to arrest the plaintiff for an underlying offense "precludes summary judgment on [the] [p]laintiff's claim that he was improperly arrested for resisting arrest." *Jackson v. City of New York*, 29 F. Supp. 3d 161, 178 (E.D.N.Y. 2014).

The Court has already established that Officers Garcia and Golden, based on their observation of Plaintiff instigating a loud dispute and physical altercation within a crowd, had probable cause to arrest Plaintiff for disorderly conduct or harassment in the second degree under New York Penal Law section 240.20 and section 240.26.

It is undisputed that the remaining officers arrived on the scene and observed "two officers on the ground trying to get a person in handcuffs." (Zweigbaum Dep. 27.) Plaintiff was kicking his feet, rolling around, and disregarding the officers' commands to put his arms behind his back. (*Id*. at 28, 33–34, 82.) Based on these observations, Zweigbaum believed that Plaintiff was "resisting arrest," (*id*. at 82). Similarly, Francis testified that he arrived at the scene to see Garcia and Golden wrestling with Plaintiff. (Francis Dep. 23.) Francis believed that the officers were trying to place Plaintiff under arrest, although he did not know why the officers were arresting him. (*Id.*)

There is no dispute that Zweigbaum and Francis observed Plaintiff resisting arrest by

Golden and Garcia. First, Plaintiff testified at his deposition that he had no recollection of this portion of the incident. (Pl. Dep. 38, 41.) Second, the videotape, which captured the scene at the very moment that Zweigbaum and Francis arrived, is consistent with their accounts of what they witnessed. That videotape depicts two officers wrestling with a suspect on the ground, and attempting to roll him into a prone position in order to handcuff him. (*See* Pl. Ex. M.)

In sum, the Court finds that there are no genuine issues of material fact as to whether there was probable cause to arrest Plaintiff. Since the existence of probable cause is a complete defense to a civil rights action arising from an arrest, *see Daniels v. D'Aurizo*, 564 F. Supp. 2d 194, 197 (W.D.N.Y. 2008); *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir.1994), the Court dismisses Plaintiff's false arrest claim.

### d. Plaintiff's excessive force and failure to intervene claims

Plaintiff asserts (1) excessive force claims against Golden and Garcia; and (2) failure to intervene claims against Francis and Golden.[4] (Pl. Opp'n 15.) The City Defendants argue that the Court should grant summary judgment as to the excessive force claim against Golden[5] and failure to intervene claims against Golden and Francis because (1) the force used by Golden in grabbing Plaintiff from behind, taking him down to the ground, and attempting to handcuff him was objectively reasonable under the circumstances; and (2) neither Francis nor Golden had reasonable opportunity to intervene to stop Garcia. (City Defs. Reply 4–5.)

"The Fourth Amendment prohibits the use of unreasonable and therefore excessive force

---

[4] The Court notes that Plaintiff's "failure to intervene" claims were not included in his Amended Complaint. Although the City Defendants note this fact, they did not object to consideration of the claim. The Court therefore reviews the merits of the claim.

[5] Garcia does not move for summary judgment as to Plaintiffs' excessive force claim against him.

by a police officer" in the course of an arrest. *Tracy v. Freshwater*, 623 F.3d. 90, 96 (2d Cir. 2010) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Because the Fourth Amendment's test of reasonableness is one of "objective reasonableness," the inquiry is fact-specific and requires a balancing of various factors. *Id*. When determining whether an officer used excessive force, a court must analyze the totality of the circumstances facing the officer and consider: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy*, 623 F.3d at 96 (citations omitted); *see also Nimkoff v. Dollhausen*, 751 F. Supp. 2d 455, 463 (E.D.N.Y. 2010) ("[T]he fact finder must consider the totality of the circumstances, including 'the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest.'" (citations omitted)). However, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Tracy*, 623 F.3d at 96 (citing *Graham*, 490 U.S. at 397). Courts must "evaluate the record from the perspective of a reasonable officer at the scene, rather than with the 20/20 vision of hindsight." *Id.* (internal quotation marks omitted) (quoting *Graham*, 490 U.S. at 396). Moreover, it has long been "recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396); *See also Tracy,* 623 F.3d at 98 ("Given that [the plaintiff] was clearly resisting arrest at that point, it was not unreasonable for [the officer] to respond by diving on top of [the plaintiff] and pinning him down so that he could not get back up and continue to flee.")

"A police officer is personally involved in the use of excessive force if he either: (1) directly participates in an assault; or (2) was present during the assault, yet failed to intercede on

behalf of the victim even though he had a reasonable opportunity to do so." *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003), *aff'd sub nom. Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005) (citing *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997).

"[L]aw enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (quoting *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir. 1994) (collecting cases)). An officer may be liable for the preventable harm caused by the officer's failure to intervene during a constitutional violation where the officer "observes the [constitutional violation] and has sufficient time to act to prevent it." *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) (citation omitted); *see also Terebesi*, 764 F.3d at 244. However, "[a]n underlying constitutional violation is an essential element of a failure to intercede claim under [section] 1983." *Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 566 (S.D.N.Y. 2010) (citing *Ricciuti*, 124 F.3d at 129); *see also Wieder v. City of New York*, 569 F. App'x 28, 30 (2d Cir. 2014) ("Because the underlying constitutional claims were properly dismissed, we also affirm the district court's dismissal of plaintiff's failure to intervene claim."); *Levy v. City of New York*, 935 F. Supp. 2d 575, 594 (E.D.N.Y. 2013) ("[T]he failure to intervene claim is contingent upon the disposition of the primary claims underlying [it]." (quoting *Matthews v. City of New York,* 889 F. Supp. 2d 418, 443–44 (E.D.N.Y. 2012))).

### i. Summary judgment is appropriate as to Plaintiff's excessive force and failure to intervene claims against Golden

There is no dispute that Golden used force against Plaintiff. It is undisputed that after observing Plaintiff shoving or pushing another individual on the sidewalk in front of Bourbon Street, Golden grabbed Plaintiff by the waist or hips from behind and pulled him away from the individual he had just shoved. (Pl. 56.1 ¶ 17; City Defs. 56.1 ¶ 17; Garcia 56.1 ¶ 30; Golden Dep.

21, 23, 25; Garcia Dep. 102.)  In addition, Golden admits that he intentionally knocked Plaintiff down by hooking his leg behind Plaintiff's ankle and pushing on his shoulders, and that he landed on top of Plaintiff.  (Golden Dep. 34, 36, 75.)  Golden then struggled with Plaintiff on the ground in an attempt to handcuff him.

After examining the undisputed facts of this case, the Court concludes that no reasonable juror could find that Golden's use of force was excessive under the circumstances.  Golden's decision to grab Plaintiff from behind was reasonable.  Golden grabbed Plaintiff and pulled him away immediately after Plaintiff shoved another individual, before that individual had a chance to retaliate.  (Pl. 56.1 ¶ 17; City Defs. 56.1 ¶ 17; Garcia 56.1 ¶ 30; Golden Dep., pp. 21, 23, 25; Garcia Dep. 102; Pl. Dep. 38–39.)  Similarly, Golden's decision to take Plaintiff down to the ground was also reasonable.  According to both officers, Plaintiff unleashed a flurry of punches toward the officers after Golden released Plaintiff.  (Golden Dep., 34; Garcia Dep. 34, 46.)  Both officers testified that Plaintiff struck Garcia in the head.  (Golden Dep. 34, 75; Garcia Dep. 34, 46.)  Although Plaintiff did not recall exactly what happened after he was grabbed from behind, he initially testified that he recalled "swinging [his] arms" at the person who grabbed him.  (Pl. Dep. 38.)  Thereafter, the officers tried in vain for approximately two minutes to gain control of Plaintiff and to make him stop fighting.  (Garcia Dep. 34, 48-49; Golden Dep. 36, 75.)  Finally, Golden took Plaintiff to the ground in an effort to gain control over him.  There is no evidence that Golden's actions after Plaintiff was taken to the ground were unreasonable.  Golden denied that he ever hit or kicked Plaintiff, (Golden Dep. 67), and Plaintiff, who claims not to recall this portion of the incident, (Pl. Dep. 41–42), has adduced no evidence to the contrary.  It is undisputed that Plaintiff did not submit to handcuffing even after he was taken down to the ground.  (Golden Dep. 78; Pl. Ex. M.)  Indeed, the videotape shows Golden attempting to control

the squirming, kicking Plaintiff. (Pl. Ex. M.) It does not show an unreasonable use of force on Golden's part. (*Id.*)

Plaintiff's testimony that he suffered a chipped tooth during the course of his arrest lends some support to his claim that the force used by the police was excessive. The extent of the injury suffered by Plaintiff "may . . . provide some indication of the amount of force applied" and "is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)). However, Plaintiff has no recollection of how he chipped his tooth, (Pl. Dep. 98–99), and has provided no evidence that Golden's actions were the cause of this injury.

Lastly, Plaintiff has adduced no evidence that Golden had an opportunity to stop Garcia from stomping on Plaintiff. The videotape shows that Golden was still on the ground with his back to Garcia at the time Garcia stomps on Plaintiff. (Pl. Ex. M.) There is no indication that Golden had an opportunity to see, much less stop, Garcia. *See Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) ("An officer may be liable for the preventable harm caused by the officer's failure to intervene during a constitutional violation where the officer "observes the [constitutional violation] and has sufficient time to act to prevent it.") The Court therefore grants City Defendants' motion for summary judgment, dismissing Plaintiff's excessive force and failure to intervene claims against Golden.

### ii. Summary judgment is appropriate as to Plaintiff's excessive force and failure to intervene claims against Francis

Plaintiff does not argue that Francis himself used excessive force. Rather, Plaintiff argues that Francis could be personally liable for another officer's use of excessive force if he "failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so." (Pl.

Opp'n 13–14 (quoting *Jeffreys*, 275 F. Supp. 2d at 474)). Plaintiff reasons that because "the contemporaneous video and eyewitness reports create . . . a question as to . . . who of the named individual defendants . . . was in a position to intervene in the assault," (Pl. Opp'n 14), summary judgment should not be granted to Francis on the excessive force claim.

The undisputed evidence shows that Francis never used force and did intervene on Plaintiff's behalf. Francis, along with Officers Vernam and Cillis, were in the police van that arrived at the scene shortly after the patrol car occupied by Sergeant Zweigbaum and Officer Basilone. Most of the incident following the arrival of Sergeant Zweigbaum was captured on videotape, and both Francis and Zweigbaum were able to identify which of the several officers in the videotape was Francis. (*See* Pl. Ex. M.; Francis Dep. 24; Zweigbaum Dep. 50, 89.)

The videotape shows Francis arriving on the scene seconds after Garcia stomps on Plaintiff. (*See* Pl. Ex. M.) Francis immediately approaches Garcia and places a hand on his shoulder, directing him toward the sidewalk and away from Plaintiff. (*Id.*) After Garcia reaches the sidewalk, Francis turns back toward Plaintiff and appears to place his hand gently on Plaintiff's knee. (*Id.*) A few seconds later, he turns back toward Garcia and walks towards him, again preventing him from approaching Plaintiff. (*Id.*) The camera then pans right, showing Medina and other bystanders for about five seconds. When the camera returns to the incident, Francis is standing near the feet of Plaintiff, who appears to have been subdued. (*Id.*) Francis does not appear to touch Plaintiff at any point thereafter. (*Id.*)

Although it is possible that Francis could have used force during the five-second period that the camera was trained on Medina or at some point after the videotape ended, there is no evidence that he did so. Francis expressly denied using any force during the arrest. (Francis Dep. 100.) Zweigbaum recalled motioning to Francis to move Garcia away, but did not recall seeing

him thereafter. (Zweigbaum Dep. 35, 39, 50.) Garcia testified that Francis arrived before Plaintiff was handcuffed, but did not see what he did upon arrival. (Garcia Dep. 59, 109.) Golden recalled seeing other officers arrive, but did not know who they were. (Golden Dep. 37.) Finally, Plaintiff testified that he could not remember what happened from the time he was grabbed from behind by Golden until after he was handcuffed and placed in a police car. (Pl. Dep. 41–42.)

Because there is no evidence that Francis used any force, and the evidence shows that the force exercised by Golden was reasonable, and that Francis intervened to prevent Garcia from using additional force against Plaintiff, the Court dismisses Plaintiff's excessive force claim against Francis.

### e. Summary judgment is appropriate as to Plaintiff's fair trial claim

Plaintiff's claim of denial of a fair trial is based on the allegation that Garcia gave conflicting testimony about the location of the dispute and physical altercation that Plaintiff was engaged in prior to police intervention. (*See* Pl. Opp'n 16–17 (first quoting Zweigbaum's deposition where he stated that Garcia told him that Plaintiff was "causing problems inside" of the bar; and then quoting Francis' sworn complaint that Plaintiff was "screaming, cursing and pushing pedestrians on a public sidewalk," when referring to the beginning of the incident).) Both the City Defendants and Garcia seek summary judgment as to Plaintiff's claim of violation of his right to a fair trial.

To establish a fair trial claim based on fabrication of evidence, a plaintiff must show that "an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277 (2d Cir. 2016)

(citation omitted); *Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012) (citing *Ricciuti*, 124 F.3d at 130). Unlike a false arrest or malicious prosecution claim, "probable cause is not a defense to a claim for a denial of the right to a fair trial" based on the fabrication of evidence. *Garnett*, 838 F.3d at 277 (alteration omitted) (citing *Jovanovic*, 486 F. App'x at 152).

An investigating official may be any governmental actor that investigates alleged criminal activity, which in most cases is a police officer. *See Garnett*, 838 F.3d at 274 ("[A] Section 1983 plaintiff may sue for denial of the right to a fair trial based on a police officer's fabrication of information."); *Ricciuti*, 124 F.3d at 130 ("When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such [] action is redressable in an action for damages under [section] 1983." (citation omitted)).

A plaintiff need only produce some evidence showing that the officer's statement or evidence is false or manipulated. *See Garnett*, 838 F.3d at 269–70, 279 (holding that the plaintiff's and the officer's conflicting accounts of the events underlying the charges created an issue of fact as to falsity); *Morse v. Fausto*, 804 F.3d 538, 547 (2d Cir. 2015) (holding that the plaintiff's documents showing that the prosecutor omitted material portions of relevant evidence created an issue of fact on falsity); *Jocks*, 316 F.3d at 138 (holding that the plaintiff's testimony that the information was false was sufficient evidence to create an issue of fact as to falsity).

Whether the fabricated evidence is likely to influence a jury's decision can be satisfied by showing that the fabricated evidence was material to the prosecutor's case. *See Garnett*, 838 F.3d at 277 (holding that fabricated evidence is material when it may affect "the prosecutor's decision to pursue charges rather than to dismiss the complaint without further action" or could influence "the prosecutor's . . . assessments of the strength of the case"); *Ricciuti*, 124 F.3d at 129–30

(holding that fabricated evidence, such as a confession, is material because it is "almost certain to influence a jury's verdict").

Proof that a police officer forwarded the fabricated evidence to a prosecutor can be satisfied by direct evidence that the officer gave the evidence to the prosecutor or by other evidence from which it can be inferred that the officer forwarded the fabricated evidence to a prosecutor. *See Morse*, 804 F.3d at 547 (holding that it was clear that the fabricated evidence was forwarded to a prosecutor because the prosecutor used the fabricated evidence during a grand jury proceeding); *Higazy v. Templeton*, 505 F.3d 161, 177–78 (2d Cir. 2007) (holding that there was an issue of fact as to whether a police officer forwarded false information to a prosecutor because it appeared that the prosecutor relied on the false information at the plaintiff's bail hearing).

In addition, a plaintiff can establish a deprivation of liberty through the number of court appearances a plaintiff made post-arraignment, constraints such as bail requirements, a period of incarceration or travel restrictions. *See Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 117 (2d Cir. 1995); *Arbuckle v. City of New York*, No. 14-CV-10248, 2016 WL 5793741, at *10–11 (S.D.N.Y. Sept. 30, 2016) (collecting cases). While the number of times a plaintiff was required to appear before a state court bolsters the plaintiff's claim that the plaintiff's liberty was deprived, a lack of numerous court appearances is not dispositive. *See Burg v. Gosselin*, 591 F.3d 95, 98 (2d Cir. 2010) (holding that "[t]he number of appearances may bear upon whether there was a seizure" rising to the level of a deprivation of liberty). A plaintiff may sufficiently establish a deprivation of liberty when he or she is detained before arraignment, required to be available to reappear before the state court at any time and therefore limited in his or her travel after being released from custody, and makes at least one post-arraignment appearance before a state court. *See Swartz*, 704 F.3d at 112 ("We have consistently held that a post-arraignment defendant who is

obligated to appear in court in connection with criminal charges whenever his attendance is required suffers a . . . deprivation of liberty." (internal quotation marks omitted) (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997))); *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 216 (2d Cir. 2000) (holding that a plaintiff established a deprivation of liberty where the conditions of post-arraignment release required him to remain available to return to court and therefore remain in the state); *Norton v. Town of Islip*, No. 12-CV-4463, 2016 WL 264930, at \*4 (E.D.N.Y. Jan. 21, 2016) ("[W]hat the Second Circuit found most salient in *Rohman* and *Swartz* was . . . the obligation to return to court whenever an appearance is requested, with its attendant travel restrictions and not the number of post-arraignment court appearances required of the criminal defendant."); *cf. Burg*, 591 F.3d at 98 (holding that "the issuance of a pre-arrangement non-felony summons requiring a later court appearance, without further restrictions, does not constitute a . . . seizure"); *Arbuckle*, 2016 WL 5793741, at \*11 (finding that "merely having to respond to orders of the court is insufficient [alone] to allege a deprivation of liberty").

According to the Criminal Complaint, Garcia informed Francis that he had seen Plaintiff "screaming, cursing and pushing pedestrians off a public sidewalk." (Criminal Compl. 2.) However, according to a statement Zweigbaum gave to IAB investigators, the sergeant represented that Garcia said that Plaintiff was "causing problems inside" the bar and that he and Golden had "enter[ed] the establishment for the purpose of controlling" Plaintiff. (General Investigation Worksheet annexed to Crotty Decl. as Ex. I, Docket Entry No. 49-9.) Plaintiff argues that these inconsistent statements by Garcia form a basis for the claim of denial of fair trial because they resulted in a material harm — loss of Plaintiff's liberty for "over almost the entire day of Thanksgiving." (Pl. Opp'n 17.) Plaintiff further asserts that Plaintiff would have been released from custody sooner if this false statement had not been included in the Criminal

Complaint.  (*Id.*)

Plaintiff's arguments are flawed in two respects.  First, there is no question that Plaintiff shouted at and shoved a man on the sidewalk outside Bourbon Street and that this incident prompted Golden and Garcia to intervene.  Plaintiff admitted that he took these actions, (Pl. Dep., 36), and both Golden and Garcia witnessed the actions, and acted as a result of observing these actions, (Golden Dep. 21, 72-73; Garcia Dep. 33, 40).  There may be questions of fact surrounding exactly what happened before this incident, whether Plaintiff was also throwing punches before Golden grabbed him, and precisely whom Plaintiff was fighting.  However, there is no evidence to suggest that Garcia's claim that he saw Plaintiff "screaming, cursing and pushing pedestrians on a public sidewalk" was false.

Second, there is no evidence that this allegedly false allegation resulted in the deprivation of Plaintiff's liberty.  At most, this allegation formed the basis for only one of the three counts of disorderly conduct contained in the Criminal Complaint.  There is nothing to suggest that Plaintiff, who was released on recognizance after arraignment, would have been released from custody sooner if the Criminal Complaint had contained one less violation.  Because Plaintiff failed to show that the inconsistent statements about the location of the first encounter between Defendants and Plaintiff were material in impacting the duration of his custody upon arrest, the Court grants Garcia's and City Defendants' motions for summary judgment with respect to Plaintiff's denial of a fair trial claim.

### f.  Summary Judgment is appropriate as to Plaintiff's municipal liability claim

Plaintiff alleges that the force used against him was excessive and a result of "municipal policy or custom" due to: (1) the City's failure to "provide adequate training or supervision of its agents"; and (2) "municipal inaction such as the persistent failure to discipline subordinates who

violate civil rights . . . ."  (Pl. Opp'n 20.)  The City argues that there is no evidence to support Plaintiff's *Monell* claim and the Court should therefore grant its summary judgment motion and dismiss the claim.

In order to sustain a claim for relief pursuant to section 1983 against a municipal defendant, a plaintiff must show the existence of an official policy or custom that caused injury and a direct causal connection between that policy or custom and the deprivation of a constitutional right.  *Monell.*, 436 U.S. at 694–95 ("[A] local government may not be sued under section 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983.").

To establish a municipal liability claim, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Torraco*, 615 F.3d at140 (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)).  A plaintiff can establish an official policy or custom by showing any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff and others encountering those subordinates.  *See Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13–14 (2d Cir. 2015) (formal policy officially endorsed by the municipality); *Matusick v. Erie Cty. Water Auth.,* 757 F.3d 31, 62 (2d Cir. 2014) (widespread and persistent practice); *Carter v. Inc. Vill. of Ocean Beach*, 759 F.3d 159, 164 (2d Cir. 2014) (failure to train amounting to deliberate

indifference); *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012) (policymaking official's "express" or "tacit" ratification of low-level employee's actions).

"Although there is no heightened pleading requirement for complaints alleging municipal liability under § 1983, a complaint does not 'suffice if it tenders naked assertion[s] devoid of further factual enhancement.'" *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 301–02 (S.D.N.Y. 2015) (internal citations omitted) (first citing *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168 (1993); and then citing *Iqbal*, 556 U.S. at 678. To survive a motion to dismiss a municipal liability claim, "a plaintiff must allege facts tending to support, at least circumstantially, an inference that . . . a municipal policy or custom exists." *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (citing *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir. 1993)).

### i.    Failure to train

"[A] city's failure to train its subordinates satisfies the policy or custom requirement only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). To show deliberate indifference, a plaintiff must allege facts plausibly showing that (1) "a policymaker [knew] 'to a moral certainty' that city employees will confront a particular situation;" (2) "the situation either presents the employee with 'a difficult choice of the sort that training or supervision will make less difficult' or 'there is a history of employees mishandling the situation;'" and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Wray*, 490 F.3d at 195–96 (quoting *Walker v. City of New York,* 974 F.2d 293, 297–98 (2d Cir. 1992)); *see Reynolds*, 506

F.3d at 192 (same).

"[W]here . . . a city has a training program, a plaintiff must . . . 'identify a specific deficiency in the city's training program and establish that that deficiency is "closely related to the ultimate injury," such that it "actually caused" the constitutional deprivation.'" *Wray*, 490 F.3d at 196 (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004)). "The plaintiff must offer evidence to support the conclusion that the training program was inadequate, not '[t]hat a particular officer may be unsatisfactorily trained' or that 'an otherwise sound program has occasionally been negligently administered,' and that a 'hypothetically welltrained officer' would have avoided the constitutional violation." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440–41 (2d Cir. 2009) (quoting *Canton*, 489 U.S. at 390–91).

### ii.    Failure to supervise or discipline

A failure to "supervise city employees may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." *Wray*, 490 F.3d at 195–96 (quoting *Canton*, 489 U.S. at 388). Similarly, "municipal inaction such as the persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*." *Batista*, 702 F.2d at 397 (collecting cases). "Where plaintiffs seek to hold a municipality liable under a theory of failure to supervise or discipline, . . . they must also show that the municipal policymaker acted with deliberate indifference." *Pipitone v. City of New York*, 57 F. Supp. 3d 173, 191 (E.D.N.Y. 2014) (citing *Canton*, 489 U.S. at 388–89); *see Wray*, 490 F.3d at 195 ("The failure to train or supervise city employees may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those

with whom the city employees interact." (citing *Canton*, 489 U.S. at 388)).  Under that standard, "where the need for more or better supervision to protect against constitutional violations was obvious, but the policymaker failed to make meaningful efforts to address the risk of harm to plaintiffs," deliberate indifference "may be inferred."  *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (citations, alterations and internal quotation marks omitted).

Here, Plaintiff's *Monell* claim is based exclusively on the October 1, 2015 Report prepared by the Office of the Inspector General for the NYPD entitled, "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices" ("IG Report") (Inspector General Report ("IG Report"), annexed to Crotty Decl. as Ex. F, Docket Entry No. 49-6.)  Relying on this report, Plaintiff alleges that the force used against him was excessive and a result of "municipal policy or custom" due to: (1) the City's failure to "provide adequate training or supervision of its agents"; and (2) "municipal inaction such as the persistent failure to discipline subordinates who violate civil rights . . . ."  (Pl. Opp'n 20.)  Plaintiff further argues that the existence of the pattern of misconduct itself and not the IG Report had put the City decision makers on notice.  (*Id.* at 21.)

The IG Report involved an investigation into "all 179 cases where CCRB determined that officers used excessive or unnecessary force from 2010 to 2014."  (IG Report 3.)  The report noted that in the 179 substantiated cases, there were 207 allegations of excessive force, but characterized this as a "notably modest number, given the size of the NYPD, and a positive indication of the NYPD's restraint."  (*Id*. at 1.)

Plaintiff cites three of the seven conclusions from the IG Report as relevant to his case: (1) the NYPD's Patrol Guide did not properly instruct officers to de-escalate encounters with the public; (2) the NYPD's training did not adequately focus on de-escalation; and (3) the NYPD

"frequently failed to impose discipline even when provided with evidence of excessive force."
(Pl. Opp'n 20–21.)

The third finding was based on the study of 104 of the 207 allegations of excessive force.[6] The study determined that 35.6% of the cases adjudicated from 2010 to 2015 had not resulted in any disciplinary action. (IG Report 48.) The remaining 64.4 % had resulted in some form of discipline, with the most severe form of sanctions, namely those involving the filing of "Charges and Specifications," pursued in 33.6% of cases. (*Id.*)

At least three district courts have addressed the question of whether the IG Report alone is sufficient to establish municipal liability, and all three, albeit for different reasons, appear to conclude that it is not. *See Marlin v. City of New York*, No. 15-CV-2235, 2016 WL 4939371 (S.D.N.Y. Sept. 7, 2016); *Boddie v. City of New York*, No. 15-CV-4275, 2016 WL 1466555 (S.D.N.Y. Apr. 13, 2016); *Delorbe-Bell v. City of New York*, No. 15-CV-2344, 2016 WL 1451581 (S.D.N.Y. Apr. 12, 2016).

In the first case, *Delorbe-Bell*, the court held that the report was "insufficient to create a plausible inference of the City's deliberate indifference" to the use of excessive force. *Delorbe-Bell*, 2016 WL 1451581 at *3. The court found that the force was not pervasive or widespread, noting that the IG's Report characterized the "207 substantiated allegations between 2010 and 2014" as a "notably modest number, given the size of the NYPD." *Id*. The court in *Delorbe-Bell* further noted that the NYPD, far from doing nothing, had imposed discipline in "the majority of cases where allegations of excessive force were substantiated," with "approximately one-third" of

_____

[6] The study excluded 59 of the 179 cases because they were still pending, twelve cases because the IG's investigators found the CCRB's determination was incorrect, three cases because the CCRB had reversed itself upon reconsideration, and six cases because the statute of limitations had expired or the officer had retired. (Inspector General Report ("IG Report") 45, annexed to Crotty Decl. as Ex. F, Docket Entry No. 49-6.)

the cases resulting in "the officer receiving 'the most serious disciplinary measure [that] can be filed against an officer.'" *Id*. The court noted that "while identifying specific areas for improvement in NYPD training programs," the report did not "describe deficiencies that are 'so obvious' or 'so likely to result in a deprivation of federal rights' that they would support a plausible inference of deliberate indifference." *Id*. at *4.

In *Boddie*, the court reached the same conclusion for slightly different reasons. First, the court held that because *Boddie* involved an incident which took place in March of 2015, six months before the IG Report was issued, the report itself did not establish that the City was on notice of the alleged pattern of misconduct and was deliberately indifferent to it in October of 2015. *Id*. at *3. The court also noted that the report did not support the allegation that the City engaged in a "'persistent' failure to discipline officers for using excessive force during the relevant time period." *Id*. Second, the court held that the IG Report did not establish that the NYPD failed to train its officers. The court noted that because the report was issued after the incident at issue in *Boddie*, it could not be used to establish that the City knew of, and deliberately disregarded, deficiencies in its training program, and further noted that the imperfections in the training program did not "give rise to a plausible inference of deliberate indifference on the part of the City." *Id*. at *5 (quoting *Reynolds*, 506 F.3d at 193).

In the third case, *Marlin*, in analyzing the IG Report as a basis for a *Monell* claim, the court distinguished *Boddie* and disagreed with the court's analysis. *Marlin*, 2016 WL 4939371 at *21. The court found the fact that over 35% of officers "faced no disciplinary action for unlawful conduct plausibly suggests that the City did nothing." *Id*. However, the court did not hold that the IG Report alone was sufficient to sustain a *Monell* claim, but instead held that the IG Report, coupled with evidence from a 2012 joint research study by two law school legal clinics,

"provide[d] sufficient factual support to foreclose dismissal of the *Monell* claim" prior to discovery. *Id.*

In this case, unlike in *Marlin*, discovery has already been completed and Plaintiff has no additional evidence, solely relying on the IG Report to support his *Monell* claim. Consistent with the holding of all three cases, the Court finds that the IG Report alone is insufficient to establish *Monell* liability. First, relying on the IG Report alone does not satisfy the causality requirement for a successful municipal liability claim. *See City of Canton*, 489 U.S. at 379 (stating that the plaintiff must demonstrate a relationship between the deficiency in the training program and his injury); *see also Walker v. City of New York,* 974 F.2d 293, 298 (2d Cir. 1992) (discussing absence of a training program on *Brady* compliance and the implications for the disclosure of the materials that remained undisclosed in the plaintiff's case.") The Second Circuit has also noted that "[a]lthough *City of Canton* addressed a claim of a failure to train, the stringent causation and culpability requirements set out in that case have been applied to a broad range of supervisory liability claims[,]" including failure to discipline. *Reynolds*, 506 F.3d at 192 (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994)).

Here, Plaintiff attempts to draw parallels between the facts of his case and the cases described in the IG Report by stating that, similar to his case, the arrestees in the report were "subjected to excessive force; the arresting officers were on patrol." (Pl. Opp'n 22.) As for the deficiencies in the training program and lack of disciplinary actions, Plaintiff cites to the recommendations in the report that include "change in patrol guide and requir[ing] that officers de-escalate encounters where appropriate; improv[ing] reporting procedures; enhanc[ing] training; and establish[ing] clear disciplinary guidelines." (*Id.*) It is Plaintiff's burden to identify a specific deficiency in the city's training program and disciplinary practices and establish that that

deficiency is "closely related to the ultimate injury," such that it "actually caused" the constitutional deprivation. *Wray*, 490 F.3d at 196; *see also Reynolds*, 506 F.3d at 192. Plaintiff's general references to the deficiencies in the patrol guide, "inadequate" disciplinary actions, and the absence of "de-escalation trainings" are not sufficiently specific and Plaintiff fails to demonstrate any causal link between those general deficiencies and the alleged excessive exercise of force against Plaintiff. Second, no reasonable jury could find, based on the IG Report alone, that the City was on notice of the deficiencies in its training program in November of 2013 as the IG's Report was not issued until October of 2015[7] and there is no evidence that the deficiencies in the NYPD's training were "so obvious" before then as to make the failure to act tantamount to deliberate indifference. Moreover, as the court noted in *Boddie*, the IG's Report only recommended improvements to an existing training program, *Boddie,* No. 15-CV-4275, 2016 WL 1466555, and "the fact that training is imperfect . . . is insufficient" to establish deliberate indifference, *see Reynolds*, 506 F.3d at 193. Accordingly, the Court grants the City's motion for summary judgment as to Plaintiff's *Monell* claim because the IG Report alone, without more, is insufficient to show that the City's policy or custom resulted in the alleged use of excessive force against Plaintiff.

### g. Request for additional discovery

Anticipating that the IG Report alone might be insufficient to make out a *Monell* claim, Plaintiff requests permission to reopen discovery to "allow him to seek discovery on the failure to train, supervise and discipline claims pursuant to FRCP 56(d)." (Pl. Opp'n 23.) The Court declines to grant such permission.

---

[7] Although Plaintiff argues that the timing of the IG Report is irrelevant because the City had notice of the pattern of excessive force as a result of the pattern itself, (*see* Pl. Opp'n to City Defs. Mot. for Summ. J. 21–22), Plaintiff points to no evidence to substantiate his argument.

Rule 56(d) provides, in pertinent part, that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . allow time to obtain affidavits or declarations or to take discovery . . . ." Fed. R. Civ. P. 56(d). "A party resisting summary judgment on the ground that it needs additional discovery in order to defeat the motion must submit an affidavit pursuant to Federal Rule of Civil Procedure 56(d) . . . showing: (1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Lunts v. Rochester City Sch.* Dist., 515 F. App'x 11, 13–14 (2d Cir. 2013) (citing *Meloff v. N.Y. Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995)). "[F]ailure to file a Rule 56(d) affidavit sufficiently explaining the need for additional discovery is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Lunts.,* 515 F. App'x at 13–14 (citations and internal quotation marks omitted).

Plaintiff has not provided an affidavit or declaration explaining why he cannot provide evidence to substantiate his *Monell* claim. Rather, Plaintiff's opposition brief notes that the "*Monell* claims were presented for the first time in his Amended Complaint" and asserts that he did not have the "opportunity to obtain the discovery . . . ." (Pl. Opp'n 23.)

Although Plaintiff is correct in noting that his initial pleading did not include a *Monell* claim, Plaintiff did name the City as a Defendant in his initial Complaint. Plaintiff amended his Complaint after the City Defendants requested a pre-motion conference seeking permission to move to dismiss Plaintiff's claims against the City on the grounds that Plaintiff had not pleaded a *Monell* claim and that Plaintiff had "taken no *Monell* discovery." (Letter to Hon. Sandra L. Townes from Ashley R. Garman, dated Jan. 25, 2016, 3, Docket Entry No. 26.) In his response to

the City Defendants' pre-motion conference request, Plaintiff requested permission to "file an amended complaint expressly asserting direct claims against the municipal party," but did not request permission to reopen discovery. (Pl. Letter dated Feb. 1, 2016, 2 n.1, Docket Entry No. 28.)

Plaintiff should have known of the need to conduct *Monell* discovery from the very start of the case in March of 2015. Even assuming that Plaintiff was not aware of this need when he filed his Complaint, he was alerted to the need to do so by the City Defendants' January 25, 2016, pre-motion conference request. Yet, Plaintiff never sought *Monell* discovery or sought prior permission to reopen discovery, and he has not explained why he failed to seek *Monell* discovery. Accordingly, Plaintiff's motion to reopen discovery pursuant to Rule 56(d) is denied.

### h. Garcia's cross-claims against the City

City Defendants seek to dismiss the first three of Garcia's four cross-claims, all of which seek indemnification from the City for any amount recovered by Plaintiff from Garcia. Garcia's first cross-claim is a contribution claim, alleging that any damages that might be recovered by Plaintiff against Garcia were "due to the culpable conduct, negligent acts of omission or commission of [the City]." (Def. Garcia Answer to the First Am. Compl. ("Def. Garcia Answer"), Docket Entry No. 33.) Garcia's second and third cross-claims are based on *respondeat superior*, as Garcia alleges that he was acting "within the scope of his duties and . . . employment as a New York City Police Officer," and therefore the City is responsible for any judgment arising from his acts or omissions. (*Id.*) Garcia's fourth cross-claim alleges that the City is liable for any judgment recovered against Garcia by operation of New York General Municipal Law

section 50-k.[8]  (*Id.*).

"Claims for indemnification do not generally ripen until a judgment in the underlying action is paid."  *Harris v. Rivera*, 921 F. Supp. 1058, 1062 (S.D.N.Y. 1995) (citing *McDermott v. City of New York*, 50 N.Y.2d 211 (1980)).  "[C]ourts have generally taken two approaches when third-party defendants assert indemnification claims before judgment."  *Cucchiara v. Hollingsworth*, No. 15-CV-314, 2016 WL 6068193, at *8 (S.D.N.Y. Oct. 14, 2016).  Some have "dismissed the indemnification cross-claim as not ripe, requiring plaintiff to file suit in state court after judgment was rendered."  *Id.*  (citing *Nevares v. Morrissey*, No. 95-CV-1135, 1998 WL 265119, at *7 (S.D.N.Y. May 22, 1998)).  "Other courts have permitted defendants to assert indemnification cross-claims 'before they are technically ripe' in order to promote 'fairness and judicial economy,' but have deferred consideration of the indemnification cross-claim until after a verdict as to liability has been entered . . . ."  *Id.*

The City has not requested that the indemnification cross-claims be dismissed on ripeness grounds, and the Court declines to do so *sua sponte*.  However, the Court sees no reason to adjudicate the indemnification issues prior to any liability determination.  Accordingly, the Court denies the City's motion for summary judgement as to Garcia's cross-claims without prejudice to renew upon determination of liability.

### III. Conclusion

For the foregoing reasons, the Court grants the City Defendants' motion for summary judgment as to Plaintiff's claims for false arrest, excessive force, and denial of the right for fair trial against Defendants Francis and Golden, and Defendants Francis and Golden are accordingly

---

[8]  The City does not move for summary judgment against Garcia's fourth cross-claim, and instead notes that it is not ripe for judicial review at this stage.  (City Defs. Mem. in Supp. of City Def. Mot. 2, Docket Entry No. 42.)

dismissed from this action. The Court also grants the City Defendants' motion for summary

judgment as to Plaintiff's *Monell* claim. The Court denies the City's motion for summary

judgment as to Garcia's cross-claims without prejudice. Lastly, the Court grants Garcia's partial

motion for summary judgment as to Plaintiff's claims for false arrest and denial of the right for

fair trial.[9]


SO ORDERED:


_____
s/ MKB
MARGO K. BRODIE
United States District Judge


Dated: March 27, 2018
      Brooklyn, New York

---

[9] In addition to the named Defendants, the Amended Complaint includes Defendants John Doe 1–3, without any specific allegations against them. The Court recognizes that "situations arise in which the identity of alleged defendants may not be known prior to the filing of a complaint." *In re Murphy*, 482 F. App'x 624, 627–28 (2d Cir. 2012) (citing *Valentin v. Dinkins*, 121 F.3d 72, 75–77 (2d Cir.1997)). In such situations, "the plaintiff should be given an opportunity through discovery to identify the unknown defendants." *Id., see also Davis v. Kelly*, 160 F.3d 917, 921 (2d Cir. 1998). Here, having had ample opportunity for discovery, Plaintiff has made no attempt to identify and serve the John Doe Defendants in the three years of litigation, nor has Plaintiff explained the reasons for not doing so. The events described in the Amended Complaint occurred on November 28, 2013 (*see* Am. Compl.), and the statute of limitations for Plaintiff's section 1983 claims is three years. Thus, Plaintiff's claims against John Doe defendants are now untimely and are therefore dismissed. *See Moody v. Town of Greenburgh*, No. 09–CV–6579, 2012 WL 1174754, at *2 (S.D.N.Y. Apr. 9, 2012) (dismissing on summary judgment the plaintiff's claims against John Doe defendants 1–4, because [the plaintiff] failed to serve those defendants and the statute of limitations had run on those claims at the time of the motion).